IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| YOUNG ZHENG, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. H-06-197 |
| | § | |
| JOHN J. POGASH, NATIONAL | § | |
| JUVENILE COORDINATOR FOR | § | |
| U.S. IMMIGRATION AND | § | |
| CUSTOMS ENFORCEMENT, | § | |
| DEPARTMENT OF HOMELAND | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Pending before the Court is Plaintiff Young Zheng's Appeal of the Department
of Homeland Security's Denial of Specific Consent to Pursue Special Immigrant
Juvenile Status in Texas Family Court and Request for Preliminary Injunction and
Defendant John Pogash's Motion to Dismiss.  Having considered the argument and
evidence of the parties at a preliminary injunction hearing on February 13, 2006, as
well as the motions, submissions, and applicable law, the Court determines both the
Plaintiff's appeal of the denial of specific consent and Plaintiff's request for a
preliminary injunction should be granted.  Additionally, the Court determines the
Defendant's motion to dismiss should be denied.

BACKGROUND

This case arises under 8 U.S.C. § 1101(a)(27)(J) of the Immigration and Nationality Act ("INA"), which provides certain alien minors with a special immigration classification that may lead to permanent residency. Plaintiff Young Zheng ("Zheng") is a seventeen-year-old Chinese national who arrived in the United States in January 2003 after his father arranged to have him brought here by the Snakeheads, an international smuggling ring.[1]  He was detained by the Department of Homeland Security ("DHS") upon his arrival at Newark International Airport for the next year and a half until being released to an uncle in July 2004.[2]  Zheng alleges that upon his release from custody, the smugglers expected him to go underground to work off their $60,000

---

[1]  Zheng was his parents' second child and therefore was born in violation of China's family planning policies, which limit each family to one child.  As a result, the Chinese government forced his mother to undergo a sterilization procedure, and as punishment, his family was required to pay an annual tax for Zheng.  Zheng's mother died when he was 8.

[2]  During his time in DHS custody, Zheng's uncle hired an attorney, who appeared on Zheng's behalf and sought asylum, withholding of Zheng's removal from the country, and protection under the Convention Against Torture ("CAT").  In September 2003, an immigration judge found Zheng removable and ineligible for asylum or CAT protection. The decision was affirmed by the Board of Immigration Appeals ("BIA"), and the United States Court of Appeals for the Third Circuit denied Zheng's motion to stay removal. With new counsel, Zheng filed a motion to reopen the asylum/CAT case in May 2005, alleging a new basis for CAT protection.  The BIA denied this motion, which currently is under review by the Third Circuit.  Zheng's removal has been stayed pending the Third Circuit's review.  The Court notes that none of the asylum or CAT proceedings are involved in the instant case.

2

fee in exchange for securing his entry into the country.  Instead, Zheng enrolled in high

school in Akron, Ohio and reported monthly to the DHS office in Cleveland as required

by DHS.[3]  In April 2005, when Zheng arrived for his monthly check-in, DHS attempted

to deport him pursuant to the final removal order previously issued by the BIA.

Apparently frightened by the prospect of being returned to China, Zheng purposefully

injured himself while boarding the airplane, delaying his deportation and resulting in

a hospital stay.  DHS subsequently transferred Zheng to a secure juvenile detention

facility in Houston.

In May 2005, Zheng sought Special Immigrant Juvenile ("SIJ") status under the

INA, which allows alien minors determined to be abused, neglected or abandoned to

stay in the United States and apply for a permanent visa.  In order to obtain SIJ status,

a Texas family court must determine that Zheng is eligible for long-term foster care

because of abuse, neglect or abandonment and that it is not in his best interests to return

to China.  However, because he was initially detained by DHS upon his entry into the

country, DHS must consent to this dependency hearing.  To date, Defendant John

---

[3]  Zheng states DHS would not permit him to work upon his release, and required
that he report to DHS monthly.  He complied with DHS requirements, missing school
only on check-in days and maintaining a 4.0 grade point average.  Upon Zheng's release
from custody, however, he states his smuggling debt came due because the Snakeheads
believed their end of the bargain had been fulfilled.  Because he did not go underground
and begin working off this debt, both his uncle and his father allegedly began receiving
threats from the Snakeheads.

Pogash ("Pogash"), the national juvenile coordinator for DHS's Bureau of U.S. Immigration and Customs Enforcement ("ICE"), has denied Zheng's all four of Zheng's requests for consent to proceed in state court.[4]

Zheng filed the instant action on January 18, 2006, seeking a reversal of DHS's specific consent decision and a preliminary injunction permitting him to apply for SIJ status in a Texas family court before he turns 18 on April 23, 2006.  DHS seeks dismissal of the action, arguing the Court lacks subject matter jurisdiction to consider Zheng's injunction and Pogash's denial of consent was not an abuse of discretion.

## LAW AND ANALYSIS

A.  Jurisdiction

DHS argues the Court lacks jurisdiction to decide the merits of Zheng's preliminary injunction request.  As the party seeking to invoke federal court jurisdiction, Zheng bears the burden of establishing the Court has subject matter jurisdiction.  *St. Paul Reinsurance Co., Ltd. v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir. 1998).  However, before the Court considers the parties' jurisdictional arguments, it will outline the SIJ's process.

---

[4]  At the Feb. 13, 2006 hearing, the Court inquired about how many requests for specific consent DHS receives annually.  DHS did not know the answer, but did report that not many of the requests are granted.  Pogash is charged with reviewing and deciding all specific consent requests.

1.   *SIJ Statutory Framework.*   Undoubtedly, Zheng seeks SIJ status because of the key benefit it ultimately confers: juveniles who obtain SIJ status may subsequently secure the benefits of lawful permanent residence, which includes the ability to become a naturalized citizen after five years.   *See Interoffice Memorandum for Regional Directors, Subject: Field Guidance on Special Immigrant Juvenile Status Petitions, U.S. Department of Homeland Security INS Policy and Procedural Memoranda*, 2004 WL 1638268, at *2 (May 27, 2004) (clarifying the process of adjudicating SIJ petitions).

The INA establishes a four-step procedure by which unmarried aliens under 21 years old may obtain SIJ status.   *See* 8 U.S.C. § 1101(a)(27)(J).   First, if a minor is in DHS custody, and therefore under its jurisdiction, he or she must request and obtain *specific* consent from DHS (acting on behalf of the Attorney General) to proceed before a juvenile court. § 1101(a)(27)(J)(iii)(I)(emphasis added).   Next, the state court must declare the minor dependent on the court and commit him or her to long-term foster care due to abuse, abandonment or neglect. § 1101(a)(27)(J)(I).   Third, the court must determine it is not in the minor's "best interests to be returned to the alien's or parent's previous country of nationality or country of last habitual residence." § 1101(a)(27)(J)(ii).   Finally, the minor alien must obtain DHS's *express* consent to the dependency order.   § 1101(a)(27)(J)(iii)(emphasis added).   This express consent

5

effectively gives credence to the dependency order.[5]  *See Interoffice Memorandum*, 2004 WL 1638268, at *2 (noting that "express consent is an acknowledgment that the request for SIJ classification is bona fide").

      2.  *Discretionary decision and the REAL ID Act.*[6]  The Court notes at the outset that Zheng only challenges DHS's actions during the first step of the process–its denial of *specific* consent to state court jurisdiction.   Accordingly, the Court only considers its jurisdiction over this narrow issue.   DHS argues the REAL ID Act bars judicial review of this type of discretionary determination made outside the context of removal proceedings.[7]  *See* 8 U.S.C. § 1252(a)(2)(B)(ii).   The Act provides

---

   [5]  In 1997, Congress amended SIJ eligibility, requiring specific consent to juvenile court jurisdiction to prevent "misuse of the status by those merely hoping to obtain residency, as opposed to relief from abuse, neglect or abandonment."  *Yeboah v. United States Dep't of Justice,* 223 F. Supp. 2d 650, 659 (E.D. Pa. 2002); *see also Yu v. Brown*, 92 F. Supp. 2d 1236, 1240-41 (D. N.M. 2000).   Legislative history indicates Congress aimed to curb visiting students at colleges and universities who proceeded in juvenile court for placement in foster care as a way of ultimately obtaining permanent residency.  *Yeboah*, 223 F. Supp. 2d. at 659-60.   Rather, the statute was meant only for minors who truly are in need of protection from abuse, neglect or abandonment.  *Id*.   Accordingly, DHS's consent throughout the SIJ application process affirms that each applicant is among those the statute intends to protect.

   [6]  The REAL ID Act, called such because it includes a section of legislation involves federally-approved identification cards, is part of the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami relief, an $82 billion spending bill.  *See* Pub. L. No. 109-13, 119 Stat. 231 (May 11, 2005).   Portions of the REAL ID Act amend the INA.  *See id.*

   [7]  The REAL ID Act also divested federal courts of jurisdiction to hear habeas petitions attacking removal orders.  *See Rosales v. Bureau of Immigration and Customs Enforcement*, 426 F.3d 733, 735-36 (5th Cir. 2005).   The Court notes that in the instant

>no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . .

*Id.* Therefore, DHS argues, the REAL ID Act furthers Congressional intent that discretionary decisions such as Pogash's in the instant case remain within the exclusive purview of the Attorney General and the Secretary of DHS.

In contrast, Zheng argues this portion of the statute does not apply to the process of obtaining SIJ status. He argues the plain language of § 1252(a)(2)(B)(ii) specifies that this provision of the REAL ID Act only limits judicial review of the executive decisions arising under Subchapter II of the INA. Zheng contends a decision regarding specific consent does not fall within Subchapter II. Rather, he points out that the authority for specific consent arises from Subchapter I of the INA. *See* § 1101 (a)(27)(J). Accordingly, Zheng argues, § 1252(a)(2)(B)(ii) does not limit the Court's review of this matter.

---

case, Zheng does not challenge his December 2003 order of removal but instead seeks permission only to clear the first hurdle in SIJ status and proceed before a Texas family court. Accordingly, *this* stage of his SIJ status does not implicate the REAL ID Act's prohibition of district court consideration of a collateral attack of a removal order. *See generally Gul v. Rozos*, No. 05-30327, 2006 WL 140540, at *1 (5th Cir. Jan. 19, 2006) (observing that the district court had jurisdiction to consider the case because petitioner challenged his final detention and not his removal order).

The Court agrees.  The United States Court of Appeals for the Fifth Circuit recently considered whether § 1252(a)(2)(B)(ii) removed from federal court jurisdiction the authority to review all discretionary immigration decisions.  *See Zhao v. Gonzales*, 404 F.3d 295, 302-03 (5th Cir. 2005).  The Court acknowledges both that *Zhao* was issued prior to the REAL ID Act's enactment and that the issue before the Fifth Circuit was whether it could review a BIA decision not to reopen asylum and removal proceedings rather than the DHS's denial of specific consent.  *See Zhao*, 404 F.3d at 301-02.  Still, this Court finds Zhao's reasoning to be instructive.  *See id.* at 302-04.  In *Zhao*, the court determined that 1252(a)(2)(B)(ii) "proscribes judicial review of a discretionary action only where it is specified under the subsection of title 8 that governs immigration proceedings."  *Id.* at 302.  Noting that the law is "uncharacteristically pellucid" the *Zhao* court focused on the statute's plain language, which gives discretion to the Attorney General for actions "*specified under this subchapter*."  *Id.* at 303.  The *Zhao* court determined it had jurisdiction to review the BIA decision not to reopen the plaintiff's asylum and removal proceedings because the BIA had exercised the discretion delineated by federal regulation and not that allocated to the Attorney General in § 1252.  *Id.* at 303 (concluding the statute "strips us only of jurisdiction to review discretionary authority specified in the statute").

Furthermore, the Court finds persuasive the reasoning of two circuit courts that

8

also considered whether they had jurisdiction to review the BIA denial of a motion to reopen. The United States Courts of Appeals for the Tenth and Eighth Circuits, which considered the same issue before the *Zhao* court but reached the opposite jurisdictional conclusion, focused on the same statutory language as the Fifth Circuit–the inclusion of the words "specified under this subchapter" in §1252(a)(2)(B)(ii). *Yerkovich v. Ashcroft*, 381 F.3d 990, 992-993 (10th Cir. 2004) (finding no jurisdiction because the motion to reopen was based on a statutory provision within Subchapter II); *Onyinkwa v. Ashcroft*, 376 F.3d 797, 799 (8th Cir. 2004) (same). Both circuit courts also interpreted §1252 as covering 8 U.S.C. §§1151-1378, or Subchapter II as it then existed. *Yerkovich*, 381 F.3d at 992; *Onyinkwa*, 376 F.3d at 799. Accordingly, this Court's jurisdiction to review a denial of specific consent–the first step in the SIJ process–is not precluded by the REAL ID Act.[8] However, this does not end the Court's jurisdictional analysis.

3. *The Administrative Procedures Act.* As previously stated, Zheng bears the burden to demonstrate that this Court has jurisdiction to consider his claim. *Greenberg*, 134 F.3d at 1253. He contends the Court may review DHS's denial of specific consent under the Administrative Procedures Act ("APA"). 5 U.S.C. §§ 704-

---

[8] The Court notes that an issue of status adjudication pursuant to § 1255(h) is not presently before the Court.

706 (2000). Pogash counters that the APA does not provide an independent basis for subject matter jurisdiction.

The APA provides for judicial review of challenges to final agency action. *See* 5 U.S.C. § 701 *et seq.* (2000); *Newsome v. E.E.O.C.*, 301 F.3d 227, 232 (5th Cir. 2002). Specifically, § 704 states that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."[9] § 704. Moreover, the Supreme Court has adhered to a presumption in favor of reviewability pursuant to the APA. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *abrogated on other grounds by Califano v Sanders*, 430 U.S. 99, 105 (1977). In fact, it is generally only "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply" that a court is unable to review a final agency action. *Id.*

Recognizing there is no Fifth Circuit precedent to guide the Court in its analysis, the Court is persuaded by the reasoning of other courts considering the same issue. *See M.B. v. Quarantillo*, 301 F.3d 109, 113 (3d Cir. 2002); *A.A.-M v. Alberto Gonzales,*

_____

[9] Agency action is deemed final when two conditions are satisfied. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The action must be the end of the agency's decision making process and not interlocutory, and it must be one in which "rights or obligations have been determined" or from which "legal consequences will flow." *Id.* In this case, the Court notes Zheng meets these two conditions and therefore seeks review of a final agency decision.

C05-2012C, 2005 WL 3307531, at * 2-3 (W.D. Wash. Dec. 6, 2005). Both courts focused on an internal memorandum ("Cook Memorandum") circulated through the then-Department of Immigration and Naturalization Services ("INS"), the predecessor to DHS.[10] *Quarantillo*, 301 F.3d at 113; *A.A.-M*, 2005 WL 3307531, at *3. The Cook Memorandum stated specific consent to proceed in state court should be granted (1) if it is in the best interests of the child to go before the state court; and (2) the child may be eligible for SIJ classification. *Quarantillo*, 301 F.3d at 113; *A.A.-M*, 2005 WL 3307531, at *3. Accordingly, both the *Quarantillo* and *A.A.-M* courts found the Cook Memorandum's two factors could adequately guide them in reviewing the consent denial. *Quarantillo*, 301 F.3d at 113; *A.A.-M*, 2005 WL 3307531, at *3; *see also Yeboah,* 223 F. Supp. 2d at 650 (reviewing a denial of consent on guidelines specified by the APA); *F.L. v. Thompson*, 293 F. Supp. 2d 86, 92-93 (according denials of consent the deferential abuse of discretion standard of review under the APA). In the instant action, the Court agrees it may review Pogash's denial of consent because Zheng has no other remedy in which to challenge the denial and the Court has a sufficient agency guidelines by which to review Pogash's decision. *See Quarantillo*, 301 F. Supp. 2d at 113; *A.A.-M*, 2005 WL 3307531, at *3.

---

[10] The internal memorandum, dated July 9, 1999, was issued by INS's acting assistant commissioner, Thomas E. Cook. Courts have subsequently referred to this memorandum as the Cook Memorandum. *See, e.g., Quarantillo*, 301 F.3d at 113.

Next, the Court must determine which standard of review to accord Pogash's decision. Section 706(2)(A) of the APA instructs a reviewing court to affirm the agency's final action unless the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(A); *Volpe*, 401 U.S. at 416. Accordingly, judicial review is narrow, ensuring only that the agency "considered the relevant factors in making the decision, its action bears a rational relationship to the statute's purpose, and there is substantial evidence in the record to support it. *Public Citizen, Inc. v. U.S. E.P.A.*, 343 F.3d 449, 455 (5th Cir. 2003) (quoting *Texas Oil & Gas Ass'n v. E.P.A.*, 161 F.3d 923, 934 (5th Cir. 1998)). However, the Court must not substitute its own judgment for that of the agency. *Id.* Therefore, the Court will review Pogash's decision to determine whether it was arbitrary, capricious or an abuse of discretion.

### B. Pogash's Decision Constituted an Abuse of Discretion

Zheng advances four arguments in support of his contention that Pogash abused his discretion in reviewing his case. First, Zheng argues the denial of consent is not rationally related to the purpose of SIJ. Second, he contends Pogash acted arbitrarily because he doubted Zheng's father's credibility but did not interview anyone to substantiate this belief. Third, Zheng alleges the evidence supports his claims of neglect and abandonment, which Pogash neither addressed nor refuted. Finally, Zheng

12

argues Pogash failed to apply the SIJ consent standard properly and uniformly, relying instead on his intuition or speculation in judging the credibility of Zheng's consent request. On the other hand, DHS stands behind correspondence from Pogash to Zheng regarding his reasons behind the consent denial, which indicates Pogash's belief that Zheng seeks lawful immigration status and better educational opportunities rather than protection from abuse, neglect or abandonment. Accordingly, the Court will review the evidence before Pogash when he denied consent on four occasions, the most recent of which occurred on Dec. 1, 2005.

The Court reiterates the purpose of SIJ: to offer relief for alien minors from abuse, neglect, or abandonment. It was not designed for minors whose primary goal is attaining permanent residency. Pogash repeatedly stated that Zheng offered "no sound evidence" of abandonment, apparently comparing his situation to the voluntary abandonments by families of college-age students seeking to bypass immigration law. Pogash noted concerns about the timing of Zheng's alleged abandonment–his father disowned him when the United States was pursuing Zheng's removal from the country.

Additionally, Pogash focuses on Zheng's statement under questioning upon his arrival here at Newark International Airport on January 24, 2003, wherein "he did not indicate any fear of returning to his home country." Also, Zheng kept in contact with both his father and his uncle while in custody for his first year and a half in the United

13

States.  Finally, Pogash argues that the smugglers have no incentive to harm Zheng

when he returns to China; and Zheng's family simply forfeits the $1,500 deposit paid

to the Snakeheads.

Zheng points the Court to additional evidence that Pogash considered.  He first

notes that his father did not abandon him until after Zheng was released to his uncle.[11]

His father disowned him after Zheng refused to go underground and work off his

$60,000 debt.  It was only after Zheng's refusal to work that the Snakeheads began

their aggressive campaign of harassment against his family in China and his uncle in

Akron.   And, Zheng argues, despite Pogash's views to the contrary, the Snakeheads

do have an incentive to harm him if he is sent back to China: sending a message to

those who engage in business with them that they had better hold up their ends of the

bargain or else face a violent reprimand.  Thus, Zheng argues, his father's abandonment

only  coincidentally  corresponds  to  the  timing  of  Zheng's  removal  proceedings.

Alternatively Zheng argues he suffered neglect.  As discussed in more detail below,

DHS concedes that Zheng's situation–a father handing over his 14-year-old son to a

smuggling ring to relieve his own tax burden with the expectations the boy would work

off the $60,000 bill–involves neglect.

---

[11]  The Court notes Zheng's father allegedly contracted for Zheng's smuggling to
the United States in order to appease his stepmother's apparent unhappiness about
Zheng's annual tax, which burdened his family.

14

The Court is guided in part by the few other courts who have reviewed a denial of specific consent for an abuse of discretion. *See Quarantillo*, 301 F.3d at 115-16; 657-58; *A.A.-M.*, 2005 WL 3307531, at * 3-4.  In *A.A.-M*, the court determined the denial of consent, made based on dispositive credibility determinations but without a single interview of the minor, constituted an abuse of discretion. *A.A.-M*, 2005 WL 3307531, at *3.  Similarly, Zheng's attorneys repeatedly asked Pogash to interview their client to avoid a denial based on an assessment of Zheng's credibility because of evidence such as the interview with DHS upon his initial detention.  Moreover, Zheng presented ample evidence supporting his father's abandonment of him, including his father's testimony from China.   While a transcript loses some of the speaker's inflection, his father's testimony is sadly unmistakable: Zheng's father has publicly disowned his son.  The legislative history indicates that the first SIJ case–and the type of case for which SIJ status was enacted–involved a small child whose parents sexually and physically abused her.  *See Yeboah*, 223 F. Supp. 2d at 659.  While Zheng's situation was not as extreme, his situation more closely resembles one involving abusive parents than the voluntary abandonments Congress sought to curb when it amended the SIJ statute in 1997.  Zheng's father shipped him to the United States via international smugglers, arranging for Zheng to be responsible for paying for his journey here.  Even DHS acknowledges these acts constitute neglect.

According to its own standards, DHS is supposed to give specific consent if doing so serves the alien minor's best interests and it appears Young will be eligible for SIJ classification.  As more thoroughly examined below, the Court finds that both factors are present in the instant case.  Finally, unlike the *Yeboah* court's decision to affirm the consent denial, the Court notes that in this case, DHS offered no evidence–other than Pogash's letters of his belief regarding Zheng's credibility–to refute his claims of abandonment and neglect or to support a denial of consent.  *See Yeboah*, 223 F.Supp.2d at 657 ("we believe most persuasively, the INS presents evidence tending to refute the idea that [plaintiff's] father abandoned or neglected him").  It does not appear that Pogash considered the relevant factors, that the denial of consent rationally relates to the SIJ statute's purpose, or that there is substantial evidence in the record to support it.  *See Public Citizen, Inc.*, 343 F.3d at 455.  Accordingly, based on the foregoing, the Court concludes that Pogash's denial of consent constituted an abuse of discretion because the decision was made arbitrarily and capriciously.

C.  Zheng Has Established the Requisite Elements For a Preliminary Injunction

Because Zheng has established that Pogash abused his discretion in denying him specific consent, the Court will consider Zheng's request for a preliminary injunction.  Pursuant to Federal Rule of Civil Procedure 65(a), Zheng seeks to enjoin Pogash from

16

denying specific consent to appear in a Texas state court.  *See* FED. R. CIV. P. 65(a).
To warrant a preliminary injunction, Zheng must demonstrate by a preponderance of
the evidence that: (1) there is a substantial likelihood that he will succeed on the merits;
(2) a preliminary injunction is necessary to prevent irreparable injury; (3) the threatened
injury to the plaintiff outweighs the harm a preliminary injunction would cause the
opposing party; and (4) granting a preliminary injunction will not disserve the public
interest.  *Planned Parenthood of Houston and Southeast Tex. v. Sanchez*, 403 F.3d
324, 329 (5th Cir. 2005); *Evergreen Presbyterian Ministries Inc. v. Hood*, 235 F.3d
908, 917-18 (5th Cir. 2000).  The Court will address each element in turn.

     1. *Substantial likelihood Zheng will succeed on the merits*.  Zheng seeks
a determination by a Texas family court that (1) he is a dependent minor and eligible
for long-term foster care because of abuse, neglect or abandonment and (2) it is not in
his best interests to return to China.  In order for an injunction to issue, Zheng must
demonstrate he is likely to succeed when he appears before the state court.  *See*
§ 1101(a)(27)(J).  Under Texas law, neglect includes: "leaving a child in a situation
where the child would be exposed to a substantial risk of physical or mental harm,
without arranging for the necessary care of the child . . ." and "placing a child in or
failing to remove a child from a situation that a reasonable person would realize
requires judgment or actions beyond the child's level of maturity, physical condition,

17

or mental abilities and that results in bodily injury or a substantial risk of immediate harm to the child . . . ." *See* TEX. FAM. CODE ANN. § 261.001(4)(A), (B)(I) (Vernon 2005).

At the Feb. 13, 2006 hearing, DHS admitted that Zheng's situation involved neglect: his father sent the then-14 year old, who was unable to speak English, to the United States via an international smuggling ring and agreed to have Zheng work off a $60,000 debt. In fact, there is no evidence before the Court indicating that Zheng's situation would not constitute neglect. Moreover, Zheng only must show one of the three conditions–abuse, abandonment *or* neglect–in order to be eligible for long-term foster care based on his dependency. *See* § 1101(A)(27)(J). Therefore, aside from the parties' disagreement about whether Zheng was abandoned by his family, the Court concludes that under Texas law, it is substantially likely a state court would determine that Zheng's situation constitutes neglect.

Next, Zheng must convince the state court that it is not in his best interests to return to China. Zheng's father testified that he had received threats–albeit some of them veiled–about Zheng's failure to begin repayment. These threats were sufficient to cause Zheng's father to publicly disown his son. DHS argues the Snakeheads will leave Zheng alone in China because he did not successfully enter the United States, thereby never incurring a smuggling debt. However, the Court agrees with Zheng's

arguments that his situation is somewhat atypical; most immigrants detained and deported do not have to repay their smuggling fee because the smugglers were not successful in securing the immigrants' entry into the country.  However, after his detention, Zheng was released to his uncle's care.  Zheng contends his release triggered the Snakeheads' belief that they had completed their end of the smuggling bargain. When Zheng did not go underground and devote his earnings to the Snakeheads, but instead complied with DHS requirements and excelled in high school, the smugglers began attempting to collect on the debt.  Zheng further offers two experts statements that support his contention that he will be in danger if he returns to his home country.[12] The Court concludes that it is likely that a Texas court also will find that returning to China would not be in Zheng's best interests.  Thus, Zheng meets his burden of showing a substantial likelihood of success on the merits if permitted to appear in state court.

    2.  *Zheng will suffer irreparable injury without the injunction.*  As discussed above, Zheng argues time is of the essence because if he obtains his requested relief, he must appear before a Texas court before he turns 18 on April 23, 2006, or that court will have lost jurisdiction over him.  *See* TEX. FAM. CODE ANN. §

---

[12]  The experts also state that the Chinese government is likely to seek retribution for Zheng's unauthorized departure from China.

101.003(a) (Vernon 1995) (defining a child as someone under 18 years old who is not currently and has not ever been married).   Therefore, he will be ineligible for determinations that he should be placed in long-term foster care due to abuse, neglect or abandonment, and that it is not in his best interests to return to China.   *See* § 1101(a)(27)(J).   Zheng argues not allowing him to secure consideration in a Texas family court before April 23, 2006 will constitute irreparable injury.   DHS does not appear to dispute this factor.   Accordingly, the Court finds that Zheng has proven by a preponderance of the evidence that a preliminary injunction is necessary to prevent his irreparable injury.

   3.   *Threatened injury to Zheng outweighs the harm an injunction would cause to the DHS.*   The third element required for a preliminary injunction involves a balancing of the equities in which the Court weighs the impact a preliminary injunction would have on Pogash against the harm Zheng will suffer if the injunction is denied. The Court finds that issuing a preliminary injunction would cause an insubstantial amount of harm, if any, to Pogash or DHS.   Conversely, as discussed above, the threatened injury–inability even to seek a dependency determination by a Texas family court prior to his attaining age 18, thereby foreclosing the remainder of the SIJ process–would constitute irreparable injury to Zheng.   Accordingly,  the Court determines Zheng has proven by a preponderance of the evidence that his threatened

injury outweighs any possible harm to Pogash and DHS.

    4.  *A Preliminary Injunction Will Not Disserve the Public Interest.*  Zheng argues the public has an interest ensuring that immigrants, especially children, who technically qualify for certain relief be able to obtain it.  Indeed, SIJ status was created to protect children who have been abused, abandoned or neglected.  *See Yeboah*, 223 F. Supp. 2d at 659-60 (discussing the purpose of SIJ status and its legislative history).  Additionally, those in the public who are aware of Zheng's situation, including his high school teachers and the facility staff where Zheng has been in custody, have rallied in support of his attainment of consent.  On the other hand, DHS argues  that the United States cannot singlehandedly transform or rectify all the wrongs in the world.  While the Court agrees the United States cannot singlehandedly right all wrongs, it determines that the public has an interest in ensuring that the laws designed to protect children are applied in cases such as Zheng's, where such protection from abandonment, neglect and an international smuggling ring is needed most.  Accordingly, the Court concludes an injunction will not disserve the public interest.

## CONCLUSION

Based on the foregoing, the Court hereby

    ORDERS Plaintiff Young Zheng's Appeal of the Department of Homeland Security's Denial of Specific Consent to Pursue Special Immigrant Juvenile Status

in Texas Family Court and Request for Preliminary Injunction is GRANTED and Defendant John Pogash's Motion to Dismiss is DENIED.  Defendant Pogash shall immediately provide specific consent to Plaintiff Young Zheng to allow him to proceed before a Texas state court for a dependency determination.  The Court further

ORDERS Defendant John Pogash hereby enjoined from further denying Zheng's request for specific consent to appear before a Texas court.

This preliminary injunction is effective immediately upon entry of this Order and Plaintiff Young Zheng's filing a bond or security in the amount of $100, pursuant to Federal Rule of Civil Procedure 65(c).  Any violation of this Order shall be punishable by contempt of court.

SIGNED at Houston, Texas, on this 23rd day of February, 2006.

_____ David Hittner

DAVID HITTNER
United States District Judge